

09 CV 826

Christopher P. Schueller (CS 9525)
**BUCHANAN INGERSOLL & ROONEY PC**
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219–1410
Attorneys for Plaintiff Prospect Capital Corporation

### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PROSPECT CAPITAL CORPORATION, individually and derivatively on behalf of ESA ENVIRONMENTAL SPECIALISTS, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CHARLES J. COLE, NATHAN M. BENDER, DAVID C. EPPLING, JACOB COLE, , JOHN M. MITCHELL, SHELTON SMITH, SANDRA DEE COLE, MICHAEL ANTHONY HABOWSKI, DENNIS M. MOLESEVICH, TRACEY HAWLEY, CHERRY BEKAERT & HOLLAND LLP, ELLIOT AND WARREN, ADKISSON, SHERBERT & ASSOCIATES, HOULIHAN SMITH, CHESTER J. BANULL, and SUNTRUST BANKS, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.

JAN 28 2009
U.S.D.C. S.D. N.Y.
CASHIERS

**JURY TRIAL DEMANDED**

### COMPLAINT

Plaintiff Prospect Capital Corporation ("Prospect"), by and through its undersigned

counsel, Buchanan Ingersoll & Rooney PC, files the within Complaint, individually and

derivatively on behalf of ESA Environmental Specialists, Inc. ("ESA").

### PARTIES AND THEIR AFFILIATED ENTITIES

1.     Prospect is a Maryland corporation with its principal place of business in New

York.  Prospect is a mezzanine debt and private equity firm that, among other financing activities, provides control and non–control debt financing to qualified borrowers.

2.      Defendant Charles J. Cole ("Charles Cole") is an adult individual who resides in Abilene, Texas.  At all relevant times, Charles Cole was the Chief Executive Officer, a director, and the majority shareholder of ESA.  Any recovery against Charles Cole herein is only to the extent of any insurance policy proceeds which are recoverable in the absence of further order by the United States Bankruptcy Court for the District of South Carolina .

3.      CEP Holdings, LLC and CEP LLC (collectively, "CEP") are North Carolina companies with their principal places of business in North Carolina.  Charles Cole is a member of CEP.

4.      Seedco, LLC is a Delaware limited liability company with its principal place of business in Pennsylvania.  Charles Cole is a member of Seedco, LLC.

5.      Seedco NP, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Charles Cole is a shareholder of Seedco NP, Inc.

6.      Seedco NP, LLC is a Pennsylvania limited liability company with its principal place of business in Pennsylvania.  Charles Cole is a member of Seedco NP, LLC.

7.      Seedco Holding, LLC is a Delaware limited liability company with its principal place of business in Pennsylvania. Charles Cole is a member of Seedco Holding, LLC.

8.      The entities identified in Paragraphs 4 through 7 above are collectively identified as "Seedco."  Upon information and belief, Charles Cole controls each entity.

9.      Defendant Nathan M. Bender ("Bender") is an adult individual who is believed to reside in Fort Mill, South Carolina.  At all relevant times, Bender was the President and a director of ESA.

2

10. Defendant David C. Eppling ("Eppling") is an adult individual who is believed to reside in Jacksonville, Florida. At all relevant times, Eppling was the Marketing Procurement Officer and a director of ESA.

11. Defendant Jacob Cole ("Jake Cole") is an adult individual who is believed to reside in Pennsylvania. Jake Cole is Charles Cole's brother. At all relevant times, Jake Cole was the Vice President of Operations of ESA.

12. Defendant John M. Mitchell ("Mitchell") is an adult individual who is believed to reside in Charlotte, North Carolina. Mitchell became the Chief Financial Officer of ESA in approximately April of 2007.

13. Defendant Shelton Smith ("Smith") is an adult individual who is believed to reside in North Carolina. At all relevant times, Smith was employed as the Comptroller of ESA.

14. Charles Cole, Bender, Eppling, Jake Cole, Mitchell, and Smith are collectively identified herein as the "Officers and Directors."

15. Defendant Sandra Dee Cole ("Mrs. Cole") is an adult individual who is believed to reside in Abilene, Texas. Mrs. Cole is Charles Cole's wife. At all times, Mrs. Cole was a member of CEP.

16. Defendant Michael A. Habowski ("Habowski") is an adult individual who is believed to reside in Pennsylvania. At all times, Habowski was the sole shareholder of PLJ Maintenance ("PLJ"), a Pennsylvania Corporation with its principle place of business in Kulpmont, Pennsylvania.

17. Defendant Dennis M. Molesevich ("Molesevich") is an adult individual who is believed to reside in Mount Carmel, Pennsylvania. At all times, Molesevich was the sole

3

shareholder of Molesevich Construction Corporation ("Molesevich Construction"), a Pennsylvania corporation with its principal place of business located in Pennsylvania.

18.     Defendant Tracey Hawley ("Hawley") is an adult individual who is believed to reside in North Carolina.  At all relevant times, Hawley was an employee of ESA who worked in its accounting department.

19.     Defendant Cherry Bekaert & Holland, LLP ("Cherry Bekaert") is a limited liability partnership with an address of 1111 Metropolitan Avenue, Suite 1000, Charlotte, North Carolina 28204.

20.     Defendant Elliot and Warren ("Elliot & Warren") is a professional limited liability company with an address of 1300 South Mint Street, Suite 300, Charlotte, North Carolina 28203.

21.     Defendant Adkisson, Sherbert & Associates ("Adkisson Sherbert") is a professional corporation with an address of 8041 Corporate Center Drive, Suite 100, Charlotte, North Carolina 28226.

22.     Defendant Houlihan Smith ("Houlihan") is a corporation with an address of 105 W. Madison, Suite 1500, Chicago, Illinois 60602.

23.     Defendant Chester J. Banull ("Banull") is an adult individual who, upon information and belief, resides in Scranton, Pennsylvania.

24.     Defendant SunTrust Banks, Inc. ("Suntrust") is a corporation with an address of 112 S. Tryon Street, Suite 100, Charlotte, North Carolina 28202.

### JURISDICTION

25.     This Court has jurisdiction over this civil action under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 (a)(2) because this civil action arises under the laws of the United States and

4

Prospect is alleging a cause of action for violation of its rights under Title IX of the Organized Crime Control Act of 1970, as amended, 18 U.S.C. §§ 1961 *et seq.*

26.     This Court also has jurisdiction over this civil action under 28 U.S.C. § 1332 (a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

27.     Venue is proper in the United States District Court for the Southern District of New York under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to the claims occurred in this District.

28.     ESA filed a petition for Chapter 11 relief in the United States Bankruptcy Court for the Western District of North Carolina on August 1, 2007. Prospect was a creditor of ESA at the time that it was in the "zone of insolvency" and remains a creditor today. Accordingly, Prospect has standing to bring a derivative lawsuit against the Officers and Directors.

29.     In addition, ESA assigned its right to bring a derivative action against the Officers and Directors to Prospect in conjunction with the ESA bankruptcy proceeding.

30.     Prospect has exhausted all of its options to collect the debt owed by ESA, the debt amount is clear and definite, and Prospect's contractual rights to payment have been permanently frustrated.

31.     This action is not a collusive one designed to confer jurisdiction on a court of the United States that such court would not otherwise possess.

## FACTUAL BACKGROUND

32.     ESA purportedly operated as an environmental, engineering, and construction firm that specialized in providing services to government entities.

33.     Beginning no later than 2005, Defendants conspired to execute a scheme to siphon funds from the entities they operated, through a pattern of racketeering activity, for their own benefit.

## A.     The Baxter Property Ponzi Scheme

34.     The classic Ponzi scheme is an investment ruse, where the orchestrator pays earlier investors with capital infused from new investors rather than from legitimate investment returns.

35.     Sooner or later, the director of the Ponzi scheme is unable to attract enough new investors to keep the operation going — eventually causing the scheme to break down.

36.     Here, Charles Cole and Mrs. Cole conducted an elaborate twist on the classical Ponzi scheme.  Instead of paying returns to earlier investors with money infused by new investors, the Baxter Property Ponzi scheme orchestrated by Charles Cole and Mrs. Cole utilized newly obtained loans to pay off earlier lenders. The Baxter Property Ponzi scheme was operated in relation to real property that Charles Cole and Mrs. Cole purchased through CEP and fed by obtaining loans from a series of lenders based upon fraudulent representations.  The Baxter Property Ponzi scheme allowed Charles Cole and Mrs. Cole to divert and siphon off the loan funds obtained from a series of lenders into their own pockets as well as into the pockets and for the personal benefit of Bender, Eppling, and Jake Cole.  When the Baxter Property Ponzi scheme inevitably collapsed, Prospect was the last lender left "holding the bag" with no possibility of being repaid following ESA's bankruptcy.

37.     On or about February 4, 2005, CEP entered into a Real Estate Sale and Purchase Agreement with Wanda MacQueen and MacQueen Properties (together with Wanda MacQueen,

6

"MacQueen") for the purchase of real property located at 1332 Baxter Street, Charlotte, North Carolina 28204 ("Baxter Property") for one million, two hundred thousand dollars ($1,200,000).

38.     CEP paid MacQueen a deposit of ten thousand dollars ($10,000) and cash at closing in the amount of one hundred thousand dollars ($100,000). CEP issued a note to MacQueen for the remaining balance in the amount of one million, ninety thousand dollars ($1,090,000).

39.     In addition, MacQueen agreed to subordinate her note to allow BB&T Bank to hold the first lien position against the Baxter Property for an "improvement loan" made in or around February 2005 to CEP in the amount of six hundred thousand dollars ($600,000).

40.     No improvements were made to the Baxter Property, however. Upon information and belief, Charles Cole and Mrs. Cole instead used the money that CEP borrowed from BB&T to personally benefit themselves and Bender, Eppling, and Jake Cole in violation of the loan documents and the agreement with MacQueen.

41.     In or around February 2006, CEP obtained another "construction loan" that it similarly represented was going to be used to renovate the Baxter Property. This loan, in the amount of one million, three hundred and seventy-two thousand, five hundred dollars ($1,372,500), was made by RBC Centura Bank ("RBC").

42.     To perpetuate the Baxter Property Ponzi scheme, Charles Cole and Mrs. Cole caused CEP (directly or indirectly) to use the loan proceeds from RBC to payoff the remaining balance of the $600,000 BB&T "construction loan." Then, Charles Cole and Mrs. Cole, in collusion with Bender, Eppling, and Jake Cole, caused the remaining RBC loan proceeds, in the amount of $775,000, to be transferred to ESA and then to themselves.

7

43. MacQueen inexplicably agreed once again to subordinate her $1,090,000 note to CEP to the RBC "construction loan," leaving her debt now totally unsecured.

44. ESA did not use the funds that had been borrowed from RBC to renovate the Baxter Property, as represented. In fact, ESA did not identify those funds as loan proceeds on its financial records. Instead, ESA designated the $775,000 as equity — in the form of "Officer Contributions" — on its financial records. Upon information and belief, the Officers and Directors used the money borrowed for "renovations" to the Baxter Property for their own personal use.

45. Finally, knowing that ESA was effectively bankrupt, the Officer and Directors made one last effort to perpetuate the Baxter Property Ponzi scheme by borrowing monies from Prospect. As set forth in detail below, the Officers and Directors made gross misrepresentations regarding ESA's financial condition in order to induce Prospect to loan ESA money.

46. The Officers and Directors used the funds obtained from Prospect to repay RBC the balance of the $1,372,500 "construction loan." The MacQueen note was also to be paid with Prospect borrowed funds, but MacQueen inexplicably opted to transfer the debt owed to her from CEP to a Pennsylvania property. Prospect is further informed and believes that the Officers and Directors re–directed the money earmarked to pay the MacQueen note for their own personal benefit.

B. **Other Misconduct To Divert And Misappropriate ESA's Assets**

47. The Officers and Directors caused ESA to transfer certain monies to CEP, in excess of the amounts legitimately owed, in exchange for no value.

48. For example, although the lease with CEP required payments of only $25,000 per month, ESA transferred approximately $30,000 per month to CEP. Prospect is informed and believes that the fair market rental value of the leased properties was less than $20,000.

49. On March 25, 2005, the Officers and Directors also caused ESA to purchase a Certificate of Deposit in the amount of $300,000 from Wachovia Bank in the name of CEP. ESA received no consideration in exchange for the $300,000 payment that it made on CEP's behalf. Upon information and belief, the Officers and Directors diverted the $300,000 transferred to CEP for their own personal benefit.

50. Charles Cole and Bender purchased items unrelated to ESA's business, for their personal use and consumption, using ESA's credit cards. These purchases included travel expenses for family trips and/or vacations, orthodontist expenses, clothing, pet food, a wedding reception and honeymoon, cosmetic dentistry, and other personal items. In total, ESA paid approximately $1,096,270 in personal expenses of Charles Cole and Bender through this credit card scam.

51. Charles Cole purchased lavish sports utility vehicles known as "Hummers" for himself and others at ESA after purportedly obtaining a lucrative contract for ESA. When these individuals later learned that ESA was not awarded the project, however, they nevertheless kept the Hummers that had been purchased with ESA funds.

## C. The Fraud to Induce Prospect to Loan Funds to ESA

52. The Officers and Directors became aware that, as a result of the above misconduct, ESA was insolvent — or nearly insolvent — no later than the Summer of 2006.

53. The Officers and Directors consulted with outside legal counsel in the Summer and/or early Fall of 2006 to explore the possibility of ESA filing for bankruptcy protection.

9

54.     Instead of filing for bankruptcy protection, however, the Officers and Directors developed a plan to perpetuate their misconduct, and obtain additional monies for ESA that they could misappropriate for their own benefit. The plan involved fraudulently inducing Prospect to loan monies to ESA.

55.     Before approaching Prospect, certain of the Officers and Directors significantly increased the salaries that they received from ESA. Charles Cole increased his annual salary from $180,000 to $300,000, and Bender increased his annual salary from $150,000 to $225,000, in each instance knowing ESA was insolvent.

56.     Charles Cole and Bender instructed Hawley to adjust ESA's financial books and records to falsely identify their personal charges on ESA financial statements as receivables due from principal. Charles Cole and Bender further instructed Hawley to correspondingly forgive the receivables amount by reducing retained earnings. The improper accounting treatment of Charles Cole's and Bender's personal charges inflate ESA assets by creating receivables that were never paid by Charles Cole and Bender and by reducing the shareholder's retained earnings without reflecting the corresponding increase in expenses.

57.     Charles Cole and Bender also instructed Hawley to insert millions of dollars in fictitious accounts receivable, which were not legitimately owed to ESA, into ESA's financial records to inflate its earnings and assets, and misrepresent its financial condition.

58.     For example, ESA issued an invoice to PLJ in the amount of nearly $1.1 million on August 31, 2006. ESA did not provide did not provide any services to PLJ, and accordingly, was not entitled to receive any payment from PLJ.

59.     Upon information and belief, the Officers and Directors conspired with Habowski — the owner of PLJ — in an effort to misrepresent and inflate the books and records of ESA. In

exchange for allowing ESA to issue fictitious invoices, ESA hired PLJ as a chain saw operator for one of its projects. Although the average wage for such a position was only $12.20 per hour (according to the U.S. Department of Labor's Bureau of Labor Statistics), ESA paid Habowski a staggering $55.89 per hour plus fringe benefits valued at $9.75 per hour.

60.     Charles Cole also instructed Hawley to remove approximately $1.6 million in accounts payable, which ESA legitimately owed to vendors, from ESA's financial records to inflate its earnings and assets, and misrepresent its financial condition. Charles Cole instructed Hawley to maintain one such payable, in the amount of approximately $600,000, on a separate schedule that was not included in ESA's financial records.

61.     The Officers and Directors further caused ESA to represent that it held land in Pennsylvania, that Charles Cole represented to Prospect was a portion of approximately four hundred (400) acres that Seedco transferred to himself, worth approximately $10 million. The Officers and Directors knew that the land was worth no more than $6 million. Furthermore, it now appears that ESA does not possess — and may *never* have possessed — any interest in that land.

62.     ESA provided Prospect with a confidential offering memorandum dated December of 2006. The memorandum represented that ESA had EBITDA in 2006 of $2.5 million.

63.     Houlihan prepared inaccurate financial reports related to the offering memorandum that were provided to Prospect.

64.     Houlihan knew or should have known that lenders (such as Prospect) would be relying on its financial reports in deciding whether to extend credit to ESA.

65.     Prospect justifiably relied upon the inaccurate financial reports that Houlihan prepared in deciding to extend credit to ESA.

66.     The representations contained in the offering memorandum were knowingly false. In reality, ESA's EBITDA for 2006 was negative — it lost nearly $3 million that year. The EBITDA was therefore overstated by a staggering $5.5 million.

67.     Prospect also required ESA to identify all of its existing debts so that all such obligations (unless expressly exempted) could be satisfied at the closing out of the loan proceeds. The only exceptions were certain debts expressly identified on a written closing schedule.

68.     Unbeknownst to Prospect, ESA owed a former bonding agent (Zurich) approximately $2 million in conjunction with ESA's former bonding facility. The Officers and Directors purposefully concealed and failed to disclose this obligation. Zurich was therefore not paid on or before the closing.

69.     As part of the underwriting process for the loan, Prospect expressly inquired whether ESA had any existing problems with its current bonding agent. This issue was of the utmost importance to Prospect because government agencies require contractors like ESA to be bonded. Charles Cole assured Prospect that no such problems existed, and that ESA's bonding company would continue to provide the bonding necessary for ESA to contract with government entities after closing with Prospect.

70.     This representation was knowingly false. Upon information and belief, Charles Cole was aware that the bonding agent had significant problems with ESA and that ESA would not be able to obtain the bonding necessary to perform services for government entities.

71.     As part of the due diligence process for the loan, Prospect relied upon inaccurate quality of earnings reports that Cherry Bekaert prepared.

72.    Cherry Bekaert knew or should have known that lenders (such as Prospect) would be relying on its quality of earnings reports in deciding whether to extend credit to ESA.

73.    As part of the due diligence process for the loan, Prospect justifiably relied upon inaccurate financial reports that Elliot & Warren prepared.

74.    Elliot & Warren knew or should have known that lenders (such as Prospect) would be relying on its quality of earnings reports in deciding whether to extend credit to ESA.

75.    As part of the due diligence process for the loan, Prospect justifiably relied upon inaccurate financial reports that Adkisson Sherbert prepared.

76.    Adkisson Sherbert knew or should have known that lenders (such as Prospect) would be relying on its quality of earnings reports in deciding whether to extend credit to ESA.

77.    As part of the due diligence process for the loan, Prospect justifiably relied upon the inaccurate appraisals that Banull prepared.

78.    Banull knew or should have known that lenders (such as Prospect) would be relying on his appraisals in deciding whether to extend credit to ESA.

79.    In reliance upon these misrepresentations, on April 11, 2007, Prospect and ESA signed — and Prospect funded — a Credit Agreement for a term loan of $12.2 million (the "Credit Agreement").

80.    By guaranty dated as of April 11, 2007, Charles Cole personally guaranteed all of ESA's obligations to Prospect.

**D.    The Looting of Prospect Funds from ESA**

81.    When the Credit Agreement closed on April 11, 2007, Prospect provided ESA with $12.2 million in funding.

82.     On the day of the closing, ESA wired more than $1 million to the trust account of the law firm of Cole & Varano.

83.     Upon information and belief, a portion of the payment to Cole & Varano was not used to make legitimate payments that ESA owed, but instead was used for the personal benefit of the Officers and Directors.

84.     As set forth above, the obligation to pay Zurich was not disclosed as required by Section 6.1.20 of the Credit Agreement. The $2 million debt to Zurich was therefore not paid out of the closing proceeds.

85.     Within days after the closing on the Credit Agreement, and the receipt of Prospect's $12.2 million, the Officers and Directors reported a liquidity crisis to Prospect.

86.     ESA and Prospect amended the Credit Agreement on two separate occasions as a means of addressing the purported liquidity crisis: on May 5, 2007, to evidence Prospect's agreement to loan ESA an additional $625,000, and then again on May 17, 2007 to evidence Prospect's agreement to loan ESA an additional $950,000. In doing so, the Officers and Directors made further misrepresentations to Prospect asserting, *inter alia*, that the liquidity crisis was caused by unanticipated actions of ESA's bonding agents.

87.     The Officers and Directors asked Prospect to loan ESA additional monies shortly after it received these two additional loans, representing that ESA could not continue its operations without an immediate additional infusion of cash. Prospect declined to provide any additional funding.

88.     The Officers and Directors used certain of the loan proceeds to make payments directly to themselves, falsely claiming that those payments were for prior "loans" that they had made to the company.

14

89.     For example, Charles Cole caused ESA to pay himself approximately $258,000. After initially but unsuccessfully attempting to convince Hawley to falsely allocate the payment as an expense for an on–going job (and expense it as the purchase of a new drill), Cole caused ESA to book the payment as the repayment of a loan that he had allegedly made to the company.

90.     The $258,000 payment to Charles Cole was improper. Charles Cole had not loaned any money to ESA, but if he had invested money, he did so only as an equity contribution.

91.     Bender also caused ESA to pay himself approximately $225,000. Bender similarly falsely claimed that the payment was to repay him for a $200,000 loan that he had made to ESA approximately ten (10) months earlier.

92.     The $225,000 payment to Bender was improper. Bender had not loaned any money to ESA, but if he had invested money, he did so only as an equity contribution.

93.     In addition, Bender received $25,000 in supposed interest, or approximately $2,500 per month for ten (10) months, on an apparent equity investment that he improperly recouped by falsely claiming that it was a loan.

94.     Upon information and belief, Molesevich transmitted fraudulent invoices, for construction services that were never rendered, to ESA for improper payments for his own personal benefit.

95.     The Officers and Directors caused ESA to pay Molesevich Construction improper payments for construction services that were never provided to ESA.

96.     On or about April 11, 2007 when the original loan closed, Prospect, ESA, and SunTrust entered into a Blocked Account Control Agreement ("Account Control Agreement"). A true and correct copy of the Account Control Agreement is attached as Exhibit A.

97.     The Account Control Agreement granted Prospect a security interest in and exclusive control over ESA's account with SunTrust at account number 1000049695728. The purpose of the Account Control Agreement was to provide Prospect with collateral to secure the Credit Agreement.

98.     For this reason, neither ESA nor the Officers and Directors were permitted to withdraw or otherwise extract any funds from SunTrust account number 1000049695728 without Prospect's permission.

99.     Upon information and belief, the Officers and Directors withdrew all of the funds from SunTrust account number 1000049695728, totaling $507,682.61, on or about July 25, 2007 — without Prospect's permission — to use for their own personal benefit.

100.     Upon information and belief, Defendants siphoned substantial amounts of the funding provided by Prospect for their own personal benefit.

**E.     ESA's Bankruptcy**

101.     Shortly after ESA signed the Credit Agreement, ESA's current bonding agent refused to provide further bonding to ESA under the parties' bonding facility. This refusal to provide further bonding was based on problems that existed both before and after the closing of the Credit Agreement and was foreseen by the Officers and Directors.

102.     ESA could not find a substitute bonding agent. The failure to maintain a bonding facility had grave results for ESA, preventing ESA from obtaining work for government entities, and accordingly, causing ESA to suffer substantial business losses before it filed for Chapter 11 bankruptcy protection.

103.     In April 2007, around the time that the Credit Agreement was signed, ESA hired Mitchell as its new Chief Financial Officer.

104. Mitchell contacted Prospect in late June 2007 to advise that he had just finished work on the 2006 financial statements, and concluded that the EBITDA for 2006 had been grossly overstated.

105. On July 2, 2007, Mitchell provided a written report to Prospect containing his findings. Instead of EBITDA being a positive $2.5 million as set forth in the offering memorandum that ESA had provided to Prospect, Mitchell admitted that the EBITDA was in fact a negative $2,976,458.

106. ESA filed its bankruptcy petition on August 1, 2007, less than four (4) months after it received Prospect's initial loan of $12.2 million.

107. Prospect has received relief from stay in the ESA bankruptcy in order to pursue its claims, individually and derivatively on ESA's behalf, in this matter.

## COUNT I: FRAUDULENT MISREPRESENTATION
### Prospect (Individual Capacity) v. Charles Cole and Bender

108. Prospect repeats and realleges all prior allegations.

109. At all relevant times, Charles Cole and Bender were the most senior officers of ESA who were primarily responsible for its operation.

110. Charles Cole and Bender orchestrated, and were the beneficiaries of, a massive fraudulent scheme to misrepresent and conceal information from Prospect.

111. In particular, Charles Cole and Bender (1) provided Prospect with a confidential offering memorandum and financial reports which misrepresented the EBITDA of ESA for 2006 and prior years; (2) misrepresented to Prospect that ESA's bonding agent had no problems with ESA, and would continue to provide the necessary bonding; and (3) misrepresented and actively concealed the fact that ESA owed Zurich approximately $2 million.

17

112. Cole and Bender caused ESA to maintain separate sets of accounting records to accomplish their fraud.

113. Cole and Bender also caused ESA to shop for new auditors on a regular basis to perpetuate their fraudulent scheme.

114. At the time that they made these material representations, Charles Cole and Bender knew that the representations were false.

115. Charles Cole and Bender made the misrepresentations in order to induce Prospect to issue a series of loans to ESA.

116. Prospect justifiably relied upon the misrepresentations and loaned nearly $14 million to ESA. Prospect never would have loaned money to ESA had it known the true state of ESA's financial affairs.

117. As a direct and proximate result of Cole and Bender's fraudulent conduct, Prospect has suffered more than $14 million in damages plus interest, legal fees, and costs.

118. Charles Cole and Bender's fraudulent misrepresentations to induce Prospect to extend a series of loans aggregating more than $14 million — and subsequent conduct to immediately transfer the Prospect loan proceeds from ESA to themselves (or entities that they own or control), leaving ESA as a valueless carcass — were outrageous, willful, wanton, and with a conscious disregard of the rights of others. Accordingly, Prospect is entitled to punitive damages.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Charles Cole and Bender (jointly and severally), in an amount in excess of the jurisdictional limit of this Court, together with punitive damages, interest, costs, attorneys' fees to

the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT II:  NEGLIGENT MISREPRESENTATION
### Prospect (Individual Capacity) v. Charles Cole and Bender

119.    Prospect repeats and realleges all prior allegations.

120.    As set forth above, Charles Cole and Bender, *inter alia*, (1) provided Prospect with a confidential offering memorandum and financial reports which misrepresented the EBITDA of ESA for 2006 and prior years; (2) misrepresented to Prospect that ESA's bonding agent had no problems with ESA, and would continue to provide the necessary bonding; and (3) failed to disclose that ESA owed Zurich approximately $2 million.

121.    In the alternative, to the extent that Charles Cole and Bender assert that they did not know that these representations were false at the time they were made, Charles Cole and Bender should have known that they were false and/or acted with reckless disregard for the truth.

122.    Charles Cole and Bender made the misrepresentations in order to induce Prospect to issue a series of loans to ESA.

123.    Prospect justifiably relied upon the misrepresentations and loaned more than $14 million to ESA.  Prospect never would have loaned money to ESA had it known the true state of ESA's financial affairs.

124.    As a direct and proximate result of Charles Cole and Bender's fraudulent conduct, Prospect has suffered more than $14 million in damages plus legal fees and costs.

125.    Charles Cole and Bender's misrepresentations to induce Prospect to extend a loan of more than $14 million — and subsequent conduct to immediately transfer the Prospect loan proceeds from ESA to themselves (or entities that they own or control), leaving ESA as a

valueless carcass — were outrageous, wanton, and with a conscious disregard of the rights of others. Accordingly, Prospect is entitled to punitive damages.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Charles Cole and Bender (jointly and severally), in an amount in excess of the jurisdictional limit of this Court, together with punitive damages, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

### COUNT III: VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1961 *et seq.*)
**Prospect (Individual Capacity) v. Charles Cole, Bender, Eppling, Jake Cole, Mitchell, Smith, Mrs. Cole, Habowski, and Molesevich (collectively the "RICO Defendants")**

126.    Prospect repeats and realleges all prior allegations.

127.    ESA is an enterprise engaged in and the activities of which affect interstate commerce.

128.    CEP is an enterprise engaged in and the activities of which affect interstate commerce.

129.    PLJ is an enterprise engaged in and the activities of which affect interstate commerce.

130.    Seedco is an enterprise engaged in and the activities of which affect interstate commerce.

131.    Molesevich Construction is an enterprise engaged in and the activities which affect interstate commerce.

132.    Charles Cole, Bender, Eppling, Jake Cole, Mitchell, and Smith, as persons within the meaning of 18 U.S.C. § 1961(3) and, as persons employed by/associated with ESA,

conducted and participated, directly and indirectly, in the conduct of affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

133. Mrs. Cole, as a person within the meaning of 18 U.S.C. § 1961(3) and as a person employed by/associated with CEP and Seedco, conducted and participated, directly and indirectly, in the conduct of affairs of said enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

134. Habowski, as a person within the meaning of 18 U.S.C. § 1961(3) and as a person employed by/associated with PLJ, conducted and participated, directly and indirectly, in the conduct of affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

135. Molesevich, as a person within the meaning of 18 U.S.C. § 1961 (3) and as a person employed by/associated with Molesevich Construction, conducted and participated, directly and indirectly, in the conduct of affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1963(c).

136. Beginning in 2006, as a necessary component of the execution of the RICO Defendants' scheme to obtain borrowed funds and siphon them for their own benefit, the RICO Defendants conducted or participated, directly or indirectly in the conduct of the enterprises' affairs through a pattern of racketeering activity including (but not limited to) multiple instances of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

137. The RICO Defendants engaged in mail fraud in violation of 18 U.S.C. § 1341 by using the mail to make false, fraudulent, and misleading representations (or cause them to be made) in order to execute their scheme to siphon funds from the various enterprises they controlled. In particular:

(a) Upon information and belief, in or around January and February 2005, Charles Cole and Mrs. Cole used the mail to negotiate, finalize, and close the BB&T "improvement loan" related to the Baxter Property Ponzi scheme.

(b) Upon information and belief, in or around February and March 2006, Charles Cole and Mrs. Cole made use of the mail to negotiate, finalize, and close the RBC "construction loan" related to the Baxter Property Ponzi scheme.

(c) Upon information and belief, on or about July 31, 2006, the fraudulent and false invoice that Habowski submitted to ESA in order for the Officers and Directors to artificially inflate ESA's accounts receivable — a necessary component of its scheme to siphon money from the various enterprises — was sent via mail or wire transfer.

(d) Upon information and belief, the inflated and improper payments made or authorized by the Officers and Directors to Habowski, in exchange for grossly inflated chainsaw services, were made via U.S. Mail and/or wire transfer.

(e) In or around December 2006, the Officers and Directors mailed or caused to be mailed a confidential offering memorandum to Prospect.

(f) Between December 2006 and May 2007, the Officers and Directors mailed or caused to be mailed numerous financial documents, including balance sheets, income statements, statements of cash flow, and financial projections to Prospect.

(g) Upon information and belief, the inflated and improper payments that ESA made to CEP in 2006 and 2007 were made via mail and/or wire transfer.

(h) Upon information and belief, the fraudulent invoices transmitted to ESA by Molesevich were sent via mail and/or wire transfer.

(i) Upon information and belief, the improper payment made or authorized by the Officers and Directors to Molesevich, was made via U.S. Mail and/or wire transfer.

138. The RICO Defendants made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to defraud and to execute their scheme to siphon money from the enterprises that they controlled.

139.    The RICO Defendants knowingly used federally regulated mails for the purpose of executing their scheme and artifice to siphon money from the enterprises that they controlled.

140.    The use of the federally regulated mails was essential and/or incident to essential parts of the scheme and artifice to siphon money from the enterprises that the RICO Defendants controlled.

141.    The RICO Defendants engaged in wire fraud in violation of 18 U.S.C. § 1343 by using wire transfers in order to make false, fraudulent and/or misleading representations (or cause them to be made) in order to execute their scheme to siphon money from the enterprises that they controlled.  In particular:

    (a)    Upon information and belief, in or around January and February 2005, Charles Cole and Mrs. Cole used telephones, electronic mail, or the Internet to negotiate, finalize, and close the BB&T "improvement loan" related to the Baxter Property Ponzi scheme.

    (b)    Upon information and belief, in or around February and March 2006, Charles Cole and Mrs. Cole used telephones, electronic mail, or the Internet to negotiate, finalize, and close the RBC "construction loan" related to the Baxter Property Ponzi scheme.

    (c)    Between December 2006 and May 2007, the RICO Defendants used telephones, electronic mail, or the Internet to negotiate, finalize, and close the Credit Agreement and amendments thereto necessary to their scheme to siphon money from the various enterprises.

    (d)    Between December 2006 and May 2007, the RICO Defendants transmitted or caused to be transmitted financial documents, including balance sheets, income statements, statements of cash flow, and financial projections to Prospect via electronic mail over the Internet.

    (e)    Upon information and belief, the improper payment made or authorized by the Officers and Directors to Molesevich, was made via mail and/or wire transfer.

    (f)    Upon information and belief, on or about July 31, 2006 the fraudulent and false invoice that Habowski submitted to ESA in order for the Officers and Directors to artificially inflate its accounts receivable — a necessary component of Defendants' scheme to siphon money from the various enterprises — was sent via mail or wire transfer.

(g) Upon information and belief, the inflated and improper payments to Habowski, in exchange for grossly inflated chainsaw services, were made via U.S. Mail and/or wire transfer.

142. The RICO Defendants further engaged in wire fraud by utilizing the wire transfers to disburse the loan proceeds that ESA fraudulently obtained from Prospect. In particular:

(a) On the day of the closing of the loan from Prospect, ESA wired $1.3 million to RBC to repay the loan that RBC had made to CEP for the renovation of the Baxter Property (which loan proceeds had been fraudulently identified as equity contributions on ESA's financial records).

(b) On the day of the closing, ESA also wired more than $1 million to the trust account of the law firm of Cole & Varano. Prospect is informed and believes that a portion of the money was not used for legitimate ESA expenses.

(c) Upon information and belief, the inflated and improper rental payments that ESA made to CEP in 2006 and 2007 were made via wire transfer or U.S. Mail.

143. The RICO Defendants made these false, fraudulent, or misleading statements (or caused them to be made) with the intent to execute their scheme to siphon money from the enterprises that they controlled.

144. The RICO Defendants knowingly used federally regulated wire communications for the purpose of executing their scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

145. The use of the federally regulated wire communications was essential and/or incident to essential parts of the scheme and artifice to execute their scheme to siphon money from the enterprises that they controlled.

146. The acts of racketeering were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

147. The acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

148.    The loan proceeds that ESA obtained by virtue of the RICO Defendants' pattern of racketeering activities were used to perpetuate the Baxter Property Ponzi scheme and allowed Defendants' to execute their overall scheme to siphon money from the enterprises that they controlled, all of which caused injury to Prospect.

149.    Prospect was actually, proximately, and directly injured in its business and property.  In particular, Prospect loaned ESA more than $14 million that it would not have otherwise loaned but for the RICO Defendants' pattern of racketeering activities.

150.    Prospect exhausted its remedies in the bankruptcies of ESA and Charles Cole. Therefore, the damages to Prospects business are clear and definite because Prospect's contractual rights to payment have been permanently frustrated.

151.    Prospect has therefore suffered monetary damages in the amount of $14 million plus interest, professional fees incurred in investigating the RICO Defendants' misconduct, reasonable attorneys' fees, and costs.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against the RICO Defendants, jointly and severally, for compensatory damages trebled in accordance with the law, interest, costs, attorneys' fees, and any further relief that this Court deems to be just and proper.

**COUNT IV:  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. § 1962(d))
Prospect (Individual Capacity) v. Charles Cole, Bender, Eppling, Jake Cole, Mitchell,
Smith, Mrs. Cole, Habowski, Molesevich, and Hawley
(collectively the "RICO Conspiracy Defendants")**

152.    Prospect repeats and realleges all prior allegations.

153.    The RICO Conspiracy Defendants agreed and conspired to conduct the affairs of ESA, CEP, PLJ, and Seedco — collectively, the "RICO enterprises" — through a pattern of

racketeering activities consisting of multiple acts of mail fraud and wire fraud, which activities violate 18 U.S.C. § 1962(c).

154.    By agreeing to conduct the affairs of the RICO enterprises through a pattern of racketeering activities, including multiple acts of mail fraud and wire fraud in violation of 18 U.S.C. § 1962(c), the RICO Conspiracy Defendants conspired to violate 18 U.S.C. § 1962(c), which conduct violates 18 U.S.C. § 1962(d).

155.    Prospect was injured by reason of the RICO Conspiracy Defendants' violation of 18 U.S.C.A. § 1962(d), in that, as a direct and proximate result of Defendants conspiracy to violate 18 U.S.C. § 1962(c), Prospect suffered substantial monetary damages.

WHEREFORE, Prospect demands judgment in its favor and against the RICO Conspiracy Defendants, jointly and severally, for compensatory damages trebled in accordance with the law, and interest, costs, reasonable attorneys' fees, and other relief as the Court may deem appropriate pursuant to 18 U.S.C.A § 1964.

## COUNT V:  BREACH OF FIDUCIARY DUTIES
### Prospect (Derivative Capacity) v. Officers and Directors

156.    Prospect repeats and realleges all prior allegations.

157.    By virtue of their respective positions, the Officers and Directors owed fiduciary duties to ESA.  The Officers and Directors owed ESA the highest obligation of good faith, fair dealing, loyalty, and due care.

158.    The Officers and Directors breached their duties of loyalty by improperly using, diverting, and/or misappropriating the assets of ESA for their own personal benefit and use (for which ESA received no and/or inadequate consideration).

159.    The Officers and Directors breached their fiduciary duty of care, reasonable inquiry, oversight, good faith, and supervision.

160.     In particular, the Officers and Directors completely abdicated their fiduciary duties by failing to implement internal financial controls and/or otherwise inform themselves of ESA's activities and financial condition. The diversion and misappropriation of ESA's assets would have been prevented if the Officers and Directors had exercised, in good faith, prudent business judgment to protect and promote ESA's corporate interests.

161.     The Officers and Directors similarly failed to exercise due care to obtain and maintain a bonding facility necessary to obtain government contracts.

162.     As a direct and proximate result of the Officer and Directors' failure to perform their fiduciary duties, ESA suffered significant damages. The Officers and Directors are therefore liable to ESA.

WHEREFORE, Prospect (derivatively on behalf of ESA) requests that this Honorable Court enter judgment in its favor, and against the Officers and Directors, jointly and severally, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT VI: WASTE OF CORPORATE ASSETS
### Prospect (Derivative Capacity) v. Officers and Directors

163.     Prospect repeats and realleges all prior allegations.

164.     As a result of the Officer and Directors' improper conduct, and their failure to properly consider ESA's interests and conduct proper supervision, the Officers and Directors have caused ESA to waste valuable corporate assets, including (but not limited to) the excessive salaries to Charles Cole and Bender which were raised immediately before ESA received the loan proceeds from Prospect.

165.     As a result of the waste of corporate assets, the Officers and Directors are liable to ESA.

27

WHEREFORE, Prospect (derivatively on behalf of ESA) requests that this Honorable Court enter judgment in its favor, and against the Officers and Directors, jointly and severally, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT VII: BREACH OF CONTRACT
### Prospect (Individual Capacity) v. SunTrust

166. Prospect repeats and realleges all prior allegations.

167. The Account Control Agreement is a lawful and binding contract between and among Prospect, ESA, and SunTrust.

168. The Account Control Agreement prohibited ESA from withdrawing or otherwise extracting any funds from account number 1000049695728 without Prospect's permission.

169. SunTrust breached the Account Control Agreement by permitting ESA to withdraw the balance to SunTrust account number 1000049695728 without Prospect's permission.

170. Prospect has suffered damages as a result of SunTrust's breach of the Account Control Agreement.

## COUNT VIII: NEGLIGENCE
### Prospect (Individual Capacity) v. Houlihan Smith

171. Prospect repeats and realleges all prior allegations.

172. Houlihan Smith provided financials that assessed and/or addressed ESA's earnings and projected EBITDA.

173. Houlihan Smith owed a duty of care not just to ESA, but also to persons and entities that it reasonably knew would rely upon the earnings reports.

174. Houlihan Smith knew that lenders (such as Prospect) would be relying upon its earnings reports in deciding whether to extend credit to ESA.

175.    Houlihan Smith provided inaccurate financials to Prospect in breach of the applicable standard of care.

176.    Prospect's reasonable reliance on Houlihan Smith's inaccurate financial reports caused injury to Prospect.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Houlihan Smith, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

### COUNT IX:  NEGLIGENCE
**Prospect (Individual Capacity) v. Cherry Bekaert**

177.    Prospect repeats and realleges all prior allegations.

178.    Cherry Bekaert provided earnings reports that assessed and/or addressed ESA's earnings.

179.    Cherry Bekaert owed a duty of care not just to ESA, but also to persons and entities that it reasonably knew would rely upon the earnings reports.

180.    Cherry Bekaert knew that lenders (such as Prospect) would be relying upon its earnings reports in deciding whether to extend credit to ESA.

181.    Cherry Bekaert provided incorrect earnings reports to Prospect in breach of the applicable standard of care.

182.    Prospect's reasonable reliance on Cherry Bekaert's inaccurate earnings reports caused injury to Prospect.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Cherry Bekaert, for damages in excess of the jurisdictional limit, interest, costs,

attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT X: NEGLIGENCE
### Prospect (Individual Capacity) v. Elliot & Warren

183. Prospect repeats and realleges all prior allegations.

184. Elliot & Warren provided earnings reports that assessed and/or addressed ESA's earnings.

185. Elliot & Warren owed a duty of care not just to ESA, but also to persons and entities that it reasonably knew would rely upon the earnings reports.

186. Elliot & Warren knew that lenders (such as Prospect) would be relying upon its earnings reports in deciding whether to extend credit to ESA.

187. Elliot & Warren provided incorrect earnings reports to Prospect in breach of the applicable standard of care.

188. Prospect's reasonable reliance on Elliot & Warren's inaccurate earnings reports caused injury to Prospect.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against the Elliot & Warren, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT XI: NEGLIGENCE
### Prospect (Individual Capacity) v. Adkisson Sherbert

189. Prospect repeats and realleges all prior allegations.

190. Adkisson Sherbert provided earnings reports that assessed and/or addressed ESA's earnings.

191.    Adkisson Sherbert owed a duty of care not just to ESA, but also to persons and entities that it reasonably knew would rely upon the earnings reports.

192.    Adkisson Sherbert knew that lenders (such as Prospect) would be relying upon its earnings reports in deciding whether to extend credit to ESA.

193.    Adkisson Sherbert provided incorrect earnings reports to Prospect in breach of the applicable standard of care.

194.    Prospect's reasonable reliance on Adkisson Sherbert's inaccurate earnings reports caused injury to Prospect.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Adkisson Sherbert, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## COUNT XII:  NEGLIGENCE
### Prospect (Individual Capacity) v. Banull

195.    Prospect repeats and realleges all prior allegations.

196.    Banull provided appraisals that assessed and/or addressed ESA's assets or earnings.

197.    Banull owed a duty of care not just to ESA, but also to persons and entities that he reasonably knew would rely upon the appraisals.

198.    Banull knew that lenders (such as Prospect) would be relying upon his appraisals to extend credit to ESA.

199.    Banull provided incorrect appraisals to Prospect in breach of the applicable standard of care.

200.    Prospect's reasonable reliance on Banull's inaccurate appraisals caused injury to

Prospect.

WHEREFORE, Prospect requests that this Honorable Court enter judgment in its favor, and against Banull, for damages in excess of the jurisdictional limit, interest, costs, attorneys' fees to the fullest extent permitted by law, and any further relief that this Court deems to be just and proper.

## DEMAND FOR JURY TRIAL

Prospect respectfully requests a trial by jury on all issues triable to a jury.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY** PC

By:_____
    Christopher P. Schueller (CS9525)
    Gregory J. Krock (Motion to Admit *Pro Hac Vice* will be filed)

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219–1410
(412) 562–8432/3983

Attorneys for Plaintiff, **Prospect Capital Corporation**



# EXHIBIT A

# BLOCKED ACCOUNT CONTROL AGREEMENT

SunTrust Bank
Clovis Clough
112 S. Tryon Street, Suite 100
Charlotte, NC 28202

Ladies and Gentlemen:

Please be advised that pursuant to certain agreements between ESA Environmental Specialists, Inc. ("Company") and Prospect Energy Corporation ("Lender"), Company has granted to Lender a security interest in all rights of the Company with respect to account(s) number 1000049695728 (such account(s), together with all substitutions and replacements therefor, the "Deposit Account") located at SunTrust Bank ("Depositary Bank") and subject to the terms of the Deposit Agreements (defined below).

1.     **Deposit Agreements.** The terms and conditions of this Agreement are in addition to any deposit account agreements and other related agreements that Company has with Depositary Bank, including without limitation all agreements concerning banking products and services, treasury management documentation, account booklets containing the terms and conditions of the Deposit Account, signature cards, fee schedules, disclosures, specification sheets and change of terms notices (collectively, the "Deposit Agreements"). The provisions of this Agreement shall supersede the provisions of the Deposit Agreements only to the extent the provisions herein are inconsistent with the Deposit Agreements, and in all other respects, the Deposit Agreements shall remain in full force and effect. All items deposited into the Deposit Account shall be processed according to the provisions of the Deposit Agreements, as amended by this Agreement.

2.     **Security Interest.** Company has granted to Lender a security interest in, among other property, the Deposit Account and all credits or proceeds thereto and all monies, checks and other instruments held or deposited therein (all of which shall be included in the definition of the "Deposit Account"). Company represents and warrants that there are no perfected liens or encumbrances with respect to the Deposit Account and covenants with Lender that it shall not enter into any acknowledgment or agreement that gives any other person or entity except Lender control over, or any other security interest, lien or title in, the Deposit Account. Depositary Bank (i) acknowledges the above notice of the security interest granted to Lender, and (ii) confirms that it has received no currently effective notice of any pledge or assignment of the Deposit Account (other than pursuant to this Agreement).

3.     **Control.** In order to provide Lender with control over the Deposit Account, Company agrees that Depositary Bank may comply with any and all orders, notices, requests and other instructions originated by Lender directing disposition of the funds in the Deposit Account without any further consent from Company, even if such instructions are contrary to any of

Company's instructions or demands or result in Depositary Bank dishonoring items which may be presented for payment. Company agrees that instructions from Lender may include the giving of stop payment orders for any items presented to the Deposit Account, instructions to transfer funds to or for the benefit of Lender or any other person or entity, and instructions to close the Deposit Account.

4.  **Access to Deposit Account.  [CHECK ONE BOX ONLY]**

☒  (a)    The Deposit Account shall be under the sole dominion and control of Lender. Neither Company, nor any other person or entity, acting through or under Company, shall have any control over the use of, or any right to withdraw any amount from, the Deposit Account. Depositary Bank is hereby authorized and instructed to transfer all available funds (subject to Depositary Bank's funds availability policy) in the Deposit Account to such account and at such times as Lender may direct in writing to Depositary Bank.

☐  (b)    The Deposit Account shall be under the control of Lender; provided, that unless and until Depositary Bank receives Lender's written notice that Company's access to the funds in the Deposit Account is terminated, Depositary Bank shall honor Company's instructions, notices and directions with respect to the transfer or withdrawal of funds from the Deposit Account, including paying or transferring the funds to Company or any other person or entity.

Upon receipt of a written notice from Lender instructing Depositary Bank to terminate Company's access to funds in the Deposit Account ("Lender Direction Notice"), Depositary Bank shall transfer all available funds (subject to Depositary Bank's funds availability policy) in the Deposit Account in accordance with Lender's written instructions.

As for any such written notice sent under this subsection (b) to Depositary Bank, Depositary Bank shall promptly transfer to Lender the available funds as referenced above, but Depositary Bank shall not be obligated to do so until it provides written confirmation to Lender that it received the Lenders Direction Notice.

5.  **Subordination by Depositary Bank.**  Company and Depositary Bank acknowledge notice of and recognize Lender's continuing security interest in the Deposit Account and in all items deposited in the Deposit Account and in the proceeds thereof. Depositary Bank hereby subordinates any statutory or contractual right or claim of offset or lien resulting from any transaction which involves the Deposit Account if Section 4(a) is checked above or upon Depositary Bank's confirmation of receipt of Lender's notice under Section 4(b). Notwithstanding the preceding sentence, in the event any fees and expenses ("Fees") related to the Deposit Account go unpaid or any checks or other items which were deposited or credited to the Deposit Account are returned, reversed, refunded or charged back for insufficient funds or for any other reason ("Returned Items"), Depositary Bank may charge the Deposit Account or other accounts of Company maintained at Depositary Bank. If there are insufficient funds in the

2

Deposit Account or any of Company's other accounts to cover the Fees and Returned Items, Company agrees to immediately reimburse Depositary Bank for the amount of such shortfall. If Company fails to pay the amount demanded by Depositary Bank, Lender agrees to reimburse Depositary Bank within three (3) business days of demand thereof by Depositary Bank for any Returned Items to the extent Lender received payment in respect thereof pursuant to section 4 following Depositary Bank's receipt of a Lender Direction Notice.

6. **Indemnity.** Company agrees to defend, indemnify and hold Depositary Bank and its directors, officers, employees, attorneys, successors and assigns (collectively "Depositary Bank") harmless from and against any and all claims, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees (collectively, "Claims"), arising out of or in any way related to this Agreement, excepting only liability arising out of Depositary Bank's gross negligence or willful misconduct. Without regard to Company's indemnification obligations to Depositary Bank, Lender agrees to reimburse Depositary Bank for any Returned Items (the proceeds of which were received by Lender pursuant to section 4 following Depositary Bank's receipt of a Lender Direction Notice). Lender's obligations to Depositary Bank hereunder shall in no way operate to release Company from its obligations to Lender and shall not impair any rights or remedies of Lender to collect any such amounts from Company. IN NO EVENT WILL DEPOSITARY BANK BE LIABLE FOR ANY INDIRECT DAMAGES, LOST PROFITS, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHICH ARISE OUT OF OR IN CONNECTION WITH THE SERVICES CONTEMPLATED BY THIS AGREEMENT EVEN IF DEPOSITARY BANK HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.

7. **Depositary's Bank's Responsibility.** The duties of Depositary Bank are strictly limited to those set forth in this Agreement and Depositary Bank is not acting as a fiduciary for any party hereto. Depositary Bank shall be protected in relying on any form of instruction or other notice purporting to be from Lender which Depositary Bank, in good faith, believes to be genuine and what it purports to be. Depositary Bank shall have no duty to inquire as to the genuineness, validity, or enforceability of any such instruction or notice even if Company notifies Depositary Bank that Lender is not legally entitled to originate any such instruction or notice. The Deposit Account and all actions and undertakings by Depositary Bank shall be subject to all rules and regulations relating to the Deposit Account and to applicable law.

8. **Termination.** This Agreement shall not be terminable by Company so long as any obligations of Company to Lender are outstanding and unpaid. This Agreement may be terminated by Depositary Bank upon thirty (30) days prior written notice to all parties; provided, however, that Depositary Bank may terminate this Agreement immediately in the event Lender fails to make payments to Depositary Bank in accordance with section 5 above. This Agreement may be terminated by Lender in a writing sent to Depositary Bank in which Lender releases Depositary Bank from any further obligation to comply with instructions originated by Lender with respect to the Deposit Account. Any available funds remaining in the Deposit Account upon termination or deposited in thereafter shall be transferred in accordance with the provisions of section 4 above after deduction for any amounts otherwise reimbursable to Depositary Bank as provided hereunder. Termination shall not affect the rights and obligations of any party hereto with respect to any period prior to such termination.

3

9. **Legal Process and Insolvency.** In the event Depositary Bank receives any form of legal process concerning the Deposit Account, including, without limitation, court orders, levies, garnishments, attachments, and writs of execution, or in the event Depositary Bank learns of any insolvency proceeding concerning Company, including, without limitation, bankruptcy, receivership, and assignment for the benefit of creditors, Depositary Bank will respond to such legal process or knowledge of insolvency in the normal course or as required by law.

10. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The parties agree that New York is the "bank's jurisdiction" for purposes of the Uniform Commercial Code.

11. **Notices.** Except as otherwise provided in this Agreement, all notices and other communications required under this Agreement shall be in writing and may be personally served or sent by United States Mail or courier or by facsimile, and shall be deemed given when delivered in person or received by facsimile or upon deposit in the United States Mail or with such courier at the address specified below. Any party may change its address for notices hereunder by notice to all other parties given in accordance with this section 11.

Company:
ESA Environmental Specialists, Inc.
1332 Baxter Street
Charlotte, NC 28204
Attn: Nathan Bender
Facsimile: 704-509-5973
Telephone: 704-598-4407

Lender:
Prospect Energy Corporation
10 East 40th Street, 44th Floor
New York, NY 10016
Attn: Catherine Kelly
Facsimile: 212-448-9652
Telephone: 212-448-9481

Depositary Bank:
SunTrust Bank
112 S. Tryon Street, Suite 100
Charlotte, NC 28202
Attn: Clovis Clough
Facsimile: 704-347-6188
Telephone: 704-347-6186

4

12. **Miscellaneous.** This Agreement shall bind and benefit the parties and their respective successors and assigns. This Agreement may be amended only with the prior written consent of all parties hereto. None of the terms of this Agreement may be waived except as Depositary Bank may consent thereto in writing. No delay on the part of Depositary Bank in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power or privilege. The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Depositary Bank would otherwise have.

13. **Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

14. **Jury Trial Waiver.** COMPANY, LENDER AND DEPOSITARY BANK HEREBY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT.

Dated as of: _____ April 11 , 2007

Very truly yours,

ESA ENVIRONMENTAL SPECIALISTS, INC.

By: _____
Name: _____
Title: _____

PROSPECT ENERGY CORPORATION

By: _____
Name: _____
Title: _____

ACCEPTED:

SUNTRUST BANK _____

By: _____
Name: _____
Title: _____

12. **Miscellaneous.** This Agreement shall bind and benefit the parties and their respective successors and assigns. This Agreement may be amended only with the prior written consent of all parties hereto. None of the terms of this Agreement may be waived except as Depositary Bank may consent thereto in writing. No delay on the part of Depositary Bank in exercising any right, power or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power or privilege. The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Depositary Bank would otherwise have.

13. **Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

14. **Jury Trial Waiver.** COMPANY, LENDER AND DEPOSITARY BANK HEREBY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT.

Dated as of: __April__ __11__ , 2007

Very truly yours,

ESA ENVIRONMENTAL SPECIALISTS, INC.

By:_____
Name: _____
Title: _____

PROSPECT ENERGY CORPORATION

By:_____
Name: Grier Eliasek
Title: President

ACCEPTED:

SUNTRUST BANK_____

By:_____
Name: _____
Title: _____

partial exercise of any right, power or privilege hereunder preclude other or further exercise thereof or the exercise of any right, power or privilege. The rights and remedies specified herein are cumulative and are not exclusive of any rights or remedies which Depositary Bank would otherwise have.

13.     **Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

14.     **Jury Trial Waiver.** COMPANY, LENDER AND DEPOSITARY BANK HEREBY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR SERVICES RENDERED IN CONNECTION WITH THIS AGREEMENT.

Dated as of: _April     6_ , 2007

Very truly yours,

ESA ENVIRONMENTAL SPECIALISTS, INC.

By: _____
Name: Charles J. Cole
Title: CEO

PROSPECT ENERGY CORPORATION

By: _____
Name: _EVP. KLODSMANA_
Title: _PORViEDAL_

ACCEPTED:

[ _Suntrust Bank_ ]

By: _____
Name: _J. B. Lower_
Title: _Vice President_
           _Corporate Agency Services_

5

EA